IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Pierre James ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 10-cv-00078 |
| vs. ) | |
| ) | |
| Michael P. Randle, et al ) | |
| ) | |
| Defendants. ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Pierre James ("Plaintiff" or "Mr. James"), by his attorneys, for his Second Amended Complaint against Defendants, alleges as follows:

### NATURE OF THE CASE

1. Plaintiff brings this action for monetary and injunctive relief against Defendants pursuant to 42 U.S.C §1983 for violations of his rights under the First, Eighth and Fourteenth Amendments to the United States Constitution. More specifically, Mr. James alleges that certain Defendants have violated his Eighth and Fourteenth Amendment rights through the use of excessive force, failure to protect and deliberate indifference, and have violated his First Amendment rights by retaliating against him for: filing grievances; filing suit against other IDOC personnel; and attempting to engage in peaceful protest.

2. Defendants are personnel of the Illinois Department of Corrections ("IDOC"). Plaintiff brings his claims against all Defendants in their official and individual capacities.

3. On December 23, 2010, this Court dismissed several of the claims originally brought by Mr. James, *pro se*. To the extent necessary to preserve his right to appeal those dismissals, Mr. James hereby incorporates those claims as if fully stated herein.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343.

5. Venue is proper in this District Court pursuant to 28 U.S.C. § 1391 because one or more Defendant resides or can be found in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

6. Plaintiff, Pierre James, Identification No. R14787, is and at all time relevant to these claims has been an inmate at Menard Correctional Center ("Menard").

7. Defendant Douglas Coffey ("Coffey") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

8. Defendant Andrew Bennett ("Bennett") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

9. Defendant Westerman ("Westerman") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

10. Defendant Eric Presswood ("Presswood") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

11. Defendant Tina Monroe ("Monroe") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

12. Defendant Thomas Drake ("Drake") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

13. Defendant David Ealey ("Ealey") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

14. Defendant Henry Foster ("Foster") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

15. Defendant Mark Grapperhaus ("Grapperhaus") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

16. Defendant Shane Sulser ("Sulser") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

17. Defendant Charles Diercks ("Diercks") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

18. Defendant Shawn Heuer ("Heuer") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

19. Defendant Thomas ("Thomas") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

20. Defendant Brett Chandler ("Chandler") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

21. Defendant Larry Hale ("Hale") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

22. Defendant Nathan Maue ("Maue") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

23. Defendant Tracy Howell ("Howell") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

24. Defendant Bohnert ("Bohnert") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

25. Defendant Daniel Liefer ("Liefer") is or at all time relevant to these claims was employed by IDOC as a corrections officer at Menard.

26. Defendant M. Sourwine ("Sourwine") is or at all time relevant to these claims was employed by or acting under the direction of IDOC and assigned to the medical unit at Menard.

27. Defendant A. Greathouse ("Greathouse") is or at all time relevant to these claims was employed by or acting under the direction of IDOC and assigned to the medical unit at Menard.

28. Defendant B. Spiller ("Spiller") is or at all time relevant to these claims was employed by IDOC as a case worker supervisor at Menard.

29. Defendant Regina Summers ("Summers") is or at all time relevant to these claims was employed by IDOC as a counselor at Menard.

30. Defendant Jeanette Cowan ("Cowan") is or at all time relevant to these claims was employed by IDOC as a grievance officer at Menard.

31. Defendant David Hennrich ("Hennrich") is or at all time relevant to these claims was employed by IDOC as a counselor and sits on the protective custody committee at Menard.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

32. Mr. James has satisfied his legal requirement to exhaust his administrative remedies. He filed or attempted to file grievances relating to the claims alleged in this lawsuit, but those grievances went unanswered.

33. After not receiving responses to the grievances he filed on his own, Mr. James enlisted the help of his mother, Cheryl James, to try to get his grievances answered and his problems addressed. In this regard, on several occasions, Ms. James has submitted grievances on her son's behalf via facsimile.

34. Ms. James has contacted Menard and IDOC personnel to address the danger, harassment and retaliation to which Mr. James has been subjected. Defendants have responded by subjecting Mr. James to more harassment and retaliation.

## GENERAL ALLEGATIONS
### (Factual Background)

35. Mr. James has been the subject of numerous forms of retaliation, including: threats and intimidation; excessive shakedowns; physical violence; false disciplinary reports; refusal of or interference with medical treatment; and denial of his rights and privileges. Moreover, he has been purposely placed in danger of violence and retribution from other inmates due to the direct actions of Defendants. The following general allegations provide categories and examples of those retaliatory acts.

36. Mr. James filed his first grievance at Menard Correctional Center ("Menard") in November 2007. That grievance related to the disappearance of his legal documents. Shortly thereafter, Mr. James filed a grievance relating to his broken headphones. Mr. James received replacement headphones, and his legal documents were returned to him. Since that time, Mr. James subsequently filed numerous other grievances relating to the conditions of his confinement.

37. In response to Mr. James' lawful exercise of his rights and despite his compliance with Menard's grievance procedures, Defendants embarked on a pattern and practice of retaliatory conduct and harassment consisting of such things as: encouraging other inmates to threaten, harass, and assault Mr. James; conducting excessive and harassing shakedowns of Plaintiff's cell; planting, or conspiring to plant, contraband in Plaintiff's cell; writing, or conspiring to write, false reports or disciplinary tickets against Plaintiff; causing him to be transferred to segregation without cause or justification; telling inmates that Mr. James is a

"snitch" from the protective custody unit; housing him with aggressive and violent cellmates; interfering with his ability to seek medical treatment or attention; interfering with his ability to use the law library; refusing to acknowledge his hunger strikes; refusing him protective custody status; failing to respond to or investigate his grievances, or otherwise interfering with his ability to complete the grievance process; and pointing a weapon at him without cause or justification.

38. More specifically, after learning of Mr. James' grievances, Thomas began, or caused other corrections officers to begin, excessive shakedowns of Mr. James' cell.

39. Additionally, Thomas began targeting gang members at Menard for excessive shakedowns, telling them that the shakedowns were a result of the grievances filed by Mr. James. Thomas' message to the gang members was clear: stop Mr. James from filing grievances and the corrections officers will stop shaking down their cells and enforcing violations.

40. Not only did Defendants cause Mr. James to be the target of prison gangs, but their actions also caused him to begin having trouble with members of the gang which previously protected him from violence. Mr. James was eventually forced to renounce his gang membership, leaving him without any protection from his fellow inmates and rival gangs, whom Defendants continued to incite. As such, Mr. James was told by the gangs at Menard that he needed to leave Menard, "or else." Mr. James understandably interpreted this as a death threat.

41. Fearing for his life, Mr. James has since been trying to obtain a transfer from Menard to another correctional institution or, at the very least, obtain protective custody status.

Despite his justifiable claim that his life is in danger, Mr. James' requests for transfer or protective custody status have been repeatedly denied.

42.     On or around July 9, 2009, Mr. James participated in a telephone call with the judge in a civil suit he brought against corrections officers in Stateville Correctional Center. That telephone call was held in the presence, or within earshot, of several Menard corrections officers, including Defendant Thomas, and a counselor.

43.     Once Defendants learned that Mr. James was not only filing grievances about his treatment, but had also filed a civil suit against other corrections officers at a different institution, Defendants' retaliation against Mr. James intensified.

44.     Moreover, in retaliation for filing grievances and lawsuits, Defendants have deliberately and knowingly placed Mr. James' life in danger, and subjected him to threats and assaults, by sending him to segregation upon false pretenses. Once he is in segregation, Mr. James is exposed to enemies and gang members who intend to and do injure him.

45.     Despite Defendants' efforts, as well as because of them, Mr. James has continued to exercise his constitutional rights and file grievances. As such, the retaliation and harassment by Defendants is ongoing.

46.     On or around October 1, 2009, after being denied protective custody, Mr. James asked his mother, Cheryl James, who works for the Cook County, Illinois, Sheriff's Office, to contact Menard about certain corrections officers (including Bennett) excessively shaking down Mr. James' cell and interfering with his library privileges.

47.     Mr. James was then interviewed about these issues by Summers. Contrary to the interests of Mr. James, that interview was held within earshot of several corrections officers.

48. Shortly thereafter, on October 11, 2009, Bennett, one of the corrections officers who Mr. James named to his counselor and about whom his mother had complained, conducted another shakedown of Mr. James' cell. During that shakedown, Bennett broke the lid of a correspondence box in Mr. James' cell, and then proceeded to write Mr. James a ticket for having a broken box lid. At the disciplinary hearing, Mr. James was told that the only way he could avoid being sent to segregation was to plead guilty and pay a fine; Mr. James did so to avoid the dangers (of gang related assaults and retribution) he is exposed to in segregation.

49. Less than two months later, on December 4, 2009, Bennett again shook down Mr. James' cell – this time with corrections officers Coffey and Presswood (who Mr. James had also identified as corrections officers who were harassing him). During that shakedown, the corrections officers found contraband (garlic and onion) in the possession of Mr. James' cellmate, who took full responsibility for having the contraband. Despite this admission, the corrections officers placed a contraband heating device (stinger) directly on Mr. James' bed – thus framing him and falsely charging him with possession of contraband.

50. When Mr. James was cuffed and being taken to segregation for the alleged contraband, Coffey intentionally slammed him into the wall and encouraged him to fight back. Mr. James did not fight back, but his shoulder was injured due to the excessive force of the impact. During this use of force, Coffey also made a reference to Mr. James "crying to his mommy" – further demonstrating that the treatment and abuse was in retaliation for the grievances that Mr. James had filed, and his mother's attempts to have them addressed. Coffey then half walked, half dragged, Mr. James to the segregation unit, intentionally lifting his cuffed arms and injured shoulder along the way. This excessive force was committed in front of

8

Bennett and Presswood, who did nothing to protect Mr. James – and even laughed at the abuse. Mr. James' shoulder still hurts him to this day.

51. Despite their direct involvement in this matter, Bennett, Coffey and Presswood did not write disciplinary reports relating to this incident. Likely due to Mr. James' previous reported harassment by these corrections officers, the false ticket (for possession of contraband) was written and witnessed by corrections officers Diercks and Westerman – who had no direct involvement in the incident.

52. As Defendants intended, Mr. James was sent to segregation for two months, all because of the retaliation against him for asserting his First Amendment rights.

53. When Mr. James is sent to segregation, he comes into contact with inmates from general population, including active gang members and others who have repeatedly threatened his life. This is because, at Menard, inmates from protective custody are not housed separately from general population inmates in segregation. The danger this creates is greatly increased by the retaliatory actions of several other Defendants, who have repeatedly yelled, announced or otherwise told other segregation inmates that Mr. James is a "snitch" from the protective custody unit. This statement is false, but not to the inmates who hear it.

54. Consequently, Mr. James has been repeatedly threatened by other inmates in segregation. Indeed, due to Defendants' shakedowns of gang members (as retaliation for Mr. James' filing grievances and a separate civil suit) and their announcements that Mr. James is a snitch from protective custody, Mr. James' life has been threatened and he has been told that he will be blinded. While in segregation, in order to avoid being in contact with un-cuffed inmates, Mr. James has been forced to abstain from showering or going in the yard for fear that he might be severely injured, blinded or killed, as threatened.

55. However, even staying in his cell does not protect Mr. James from intimidation and assault when he is in segregation. Indeed, as a result of Defendants' retaliatory acts, Mr. James has repeatedly been spat upon and had urine and feces thrown (or squirted) on him by inmates. This has even occurred in the presence of corrections officers, who have simply laughed at these assaults and indignities.

56. Defendants have also retaliated against Mr. James for engaging in (or attempting to engage in) peaceful protest in the form of hunger strikes. When Mr. James has engaged in a hunger strike, that fact has been ignored and not reported. Defendants have refused to acknowledge Mr. James' peaceful protest in order to avoid the involvement of IDOC officials in Springfield.

57. On one occasion after Mr. James had informed Liefer, Bohnert and Grapperhaus that he intended to begin a hunger strike, he was told that he was forbidden from doing so and that another inmate would be put in his cell. Mr. James responded that he felt suicidal and asked for a crisis unit. At the crisis unit, Mr. James was simply *told* that he was not suicidal. When Mr. James responded to Greathouse that he might slit his wrist, Greathouse actually *encouraged him to do so*.

58. Mr. James was returned to his cell (without medical treatment or assistance). He said again that he might slit his wrist – and again he was encouraged to do so, this time by Liefer, Bohnert and Grapperhaus. When Mr. James actually started to cut himself, Grapperhaus told him that he needed to "cut deeper."

59. When Mr. James started bleeding and his suicidal expressions became a reality, Mr. James was taken to the medical unit. Mr. James was escorted to the medical unit by

10

Grapperhaus. On the way, knowing that Mr. James' wrist was injured, Grapperhaus purposely and maliciously twisted Plaintiff's hand cuffs, causing him extreme pain and injury.

60. After he had arrived at the medical unit and his wound was dressed, Sourwine ordered that Mr. James be taken to segregation instead of being provided treatment for his mental and physical condition.

61. Mr. James was escorted to the segregation unit by Maue. On the way, knowing that Mr. James' wrist was injured, Maue purposely and maliciously twisted Plaintiff's hand cuffs (like Grapperhaus had just done), causing him extreme pain and injury. If it was not in fact, such excessive force bordered on the inhumane.

62. Moreover, Defendants have retaliated against Mr. James by intentionally placing cellmates who are known to be violent and dangerous in his cell.

63. For example, on one occasion while Mr. James was in segregation, Defendant Drake placed a mentally unstable inmate who was known to be violent and had fought his cell-mates in the past in Mr. James' cell. When the inmate attacked Mr. James in front of Drake, Drake simply encouraged the fighting and did nothing to intervene. Due to Defendants' retaliatory acts, Mr. James has been placed in a situation where he must fight for his life, and possibly injure another inmate in order to defend himself.

64. Another threat or form of intimidation in retaliation for Mr. James filing grievances and a separate lawsuit was undertaken by Howell, who has repeatedly threatened Mr. James by pointing a weapon at him in his cell without cause or justification.

65. Mr. James has made the danger of his situation well known to his counselors, his grievance officer, as well as the protective custody committee. None have done anything to help the situation but have simply allowed it to continue, making it worse.

66. Mr. James has likewise made numerous attempts to file grievances or otherwise report these issues to his counselors and grievances officer (Cowan, Hennrich, Summers and Spiller). These persons, however, have repeatedly failed, refused, or chosen not to, report, respond or investigate these grievances. In many, if not all, of the instances, the grievances have been intercepted so that they were not delivered according to policy, or they were simply disposed of without appropriate care or consideration.

67. Mr. James' situation and its cause (retaliation) are well known at Menard. Indeed, on numerous occasions, Defendants and/or other IDOC personnel have made statements to Mr. James regarding his filing of grievances and lawsuits in relation to (or in the course of) this unlawful retaliatory conduct.

68. Mr. James is no longer safe in either general population or segregation because of Defendants' retaliatory acts. Despite the danger that he is in, his requests for protective custody status have repeatedly been denied. However, given the campaign of harassment and retaliation that has been conducted by the corrections officers in protective custody unit, as things currently stand, he is not even safe in protective custody. The retaliation must be stopped, and Mr. James must be transferred out of Menard.

**FIRST CAUSE OF ACTION – RETALIATION**
**(In violation of the First Amendment)**

69. Plaintiff realleges paragraphs 1-68 as this paragraph 69.

70. As demonstrated by the allegations above, Defendants have engaged in a pattern and practice of retaliation against Mr. James. Moreover, a chronology of events exists from which retaliation can be inferred.

71. Mr. James engaged in constitutionally protected activities, such as the filing of grievances and civil lawsuits, and engaging in peaceful protest.

12

72. Retaliation for engaging in these constitutionally protected activities was a motivating factor behind the Defendants' conduct.

73. Such retaliation has occurred in the following manner, all because Mr. James has exercised his First Amendment rights:

   a. Thomas has encouraged other inmates to threaten, harass, and assault Plaintiff.

   b. Coffey, Bennett, Hale, Monroe, Presswood, Howell, Diercks and Westerman have conducted excessive and harassing shakedowns of Plaintiff's cell.

   c. Bennett, Coffey, Diercks and Westerman have planted, or conspired to plant, contraband in Plaintiff's cell.

   d. Bennett, Coffey, Diercks, Westerman and Grapperhaus have written, or conspired to write, false reports or disciplinary tickets against Plaintiff.

   e. Bennett, Coffey, Diercks and Westerman have transferred Mr. James, or caused him to be transferred, to segregation without cause or justification.

   f. Chandler, Drake, Foster, Ealey and Heuer have told inmates that Mr. James is a "snitch" from the protective custody unit, exposing him to threats and assault by other inmates while in segregation, and forcing him to forego shower and yard.

   g. Chandler, Drake, Foster, Sulser and Heuer have intentionally housed Plaintiff with aggressive and violent cellmates.

   h. Greathouse and Sourwine have refused to provide Plaintiff with medical and/or mental health treatment or attention.

   i. Ealey, Grapperhaus and Monroe have interfered with Plaintiff's ability to seek medical treatment or attention.

   j. Monroe and Bennett have interfered with Plaintiff's ability to use the law library.

    k.   Grapperhaus, Heuer, Liefer, Bohnert, Sourwine and Greathouse have refused to acknowledge Plaintiff's hunger strikes.

    l.   Hennrich and Spiller have refused Plaintiff protective custody status.

    m.   Summers, Cowan, Spiller and Hennrich have failed to respond to or investigate Plaintiff's grievances, or otherwise interfered with Plaintiff's ability to complete the grievance process.

    n.   Howell has intentionally threatened and intimidated Plaintiff, by repeatedly pointing a weapon at him without cause or justification.

WHEREFORE, Plaintiff requests that the Court issue judgment against these Defendants and award Plaintiff compensatory and/or punitive damages in an amount to be determined at trial, along with any injunctive relief requested or otherwise determined to be appropriate and proper under the law.

### SECOND CAUSE OF ACTION – EXCESSIVE FORCE
### (In violation of the Eighth Amendment)
### (Against Defendants Coffey, Maue and Grapperhaus)

74.   Plaintiff realleges paragraphs 1-68 as this paragraph 74.

<u>Against Defendant Coffey:</u>

75.   On or around December 4, 2009, Coffey used unreasonable force on Plaintiff when he slammed Plaintiff into the wall, injuring his shoulder.

76.   Coffey intentionally used extreme or excessive cruelty toward Plaintiff for the purpose of maliciously and sadistically causing harm to him, and not in a good faith effort to maintain or restore security or discipline.

77.   Defendant's conduct caused harm to Plaintiff.

78.   Defendant acted under color of law.

Against Defendant Maue:

79. Maue used unreasonable force on Plaintiff when he repeatedly twisted the hand cuffs worn by Plaintiff (on his injured wrist) in the course of escorting Plaintiff to segregation.

80. Maue intentionally used extreme or excessive cruelty toward Plaintiff for the purpose of maliciously and sadistically causing harm to him, and not in a good faith effort to maintain or restore security or discipline.

81. Defendant's conduct caused harm to Plaintiff

82. Defendant acted under color of law.

Against Defendant Grapperhaus:

83. Grapperhaus used unreasonable force on Plaintiff when he repeatedly twisted the hand cuffs worn by Plaintiff (on his injured wrist) in the course of escorting Plaintiff to the medical unit.

84. Grapperhaus intentionally used extreme or excessive cruelty toward Plaintiff for the purpose of maliciously and sadistically causing harm to him, and not in a good faith effort to maintain or restore security or discipline.

85. Defendant's conduct caused harm to Plaintiff

86. Defendant acted under color of law.

WHEREFORE, Plaintiff requests that the Court issue judgment against these Defendants and award Plaintiff compensatory and/or punitive damages in an amount to be determined at trial, along with any injunctive relief requested or otherwise determined to be appropriate and proper under the law.

### THIRD CAUSE OF ACTION – FAILURE OF BYSTANDER OFFICER TO INTERVENE
### (In violation of the Eighth Amendment)
### (Against Presswood and Bennett)

87. Plaintiff realleges paragraphs 1-68 as this paragraph 87.

88. On December 4, 2009, Presswood and Bennett watched as Defendant Coffey used excessive force on Plaintiff by slamming Plaintiff into the wall and injuring his shoulder.

89. Presswood and Bennett were deliberately indifferent and/or failed to protect Plaintiff from that attack; which was, in part, a result or consequence of their own retaliatory actions in shaking down Plaintiff's cell and planting contraband on his bunk.

90. Coffey was using excessive force on Plaintiff.

91. Presswood and Bennett had a reasonable opportunity to prevent harm from occurring.

92. Presswood and Bennett failed to take reasonable steps to prevent harm from occurring.

93. Defendants' failure to act caused Plaintiff to be harmed.

94. Bennett and Presswood acted under color of law.

WHEREFORE, Plaintiff requests that the Court issue judgment against these Defendants and award Plaintiff compensatory and/or punitive damages in an amount to be determined at trial, along with any injunctive relief requested or otherwise determined to be appropriate and proper under the law.

### FOURTH CAUSE OF ACTION – FAILURE TO PROTECT
### (In violation of the Eighth Amendment)
### (Against Drake)

95. Plaintiff realleges paragraphs 1-68 as this paragraph 95.

96. Drake placed an inmate known to be violent and mentally unstable in Plaintiff's cell. This inmate proceeded to attack Plaintiff in front of Drake. Drake not only did not intervene, but he actually encouraged the fight.

97. Drake was deliberately indifferent and/or failed to protect Plaintiff from that attack; which was, in part, a result or consequence of his own retaliatory conduct.

98. As a result of Drake's conduct, Plaintiff was harmed.

99. Drake acted under color of law.

WHEREFORE, Plaintiff requests that the Court issue judgment against this Defendant and award Plaintiff compensatory and/or punitive damages in an amount to be determined at trial, along with any injunctive relief requested or otherwise determined to be appropriate and proper under the law.

**FIFTH CAUSE OF ACTION – DELIBERATE INDIFFERENCE**
**(In violation of the Eighth and/or Fourteenth Amendment)**

100. Plaintiff realleges paragraphs 1-68 as this paragraph 100.

101. Plaintiff has filed numerous grievances against Defendants regarding their unlawful acts. Moreover, Plaintiff has put Cowan, Summers, Spiller, and Hennrich on notice of these unlawful acts.

102. Cowan, Summers, Spiller, and Hennrich were aware of specific threats to his safety caused by the retaliatory acts of the correction officer Defendants. More specifically, Plaintiff has made known the fact that he is subject to threats of violence and assault both in general population and segregation, including having urine and feces thrown on him in segregation and having to fight off violent cellmates, due to the retaliation of corrections officer Defendants, but the following Defendants failed to take any action.

17

103. As such, Plaintiff was incarcerated under conditions that posed a substantial risk of serious harm to his health or safety.

104. Cowan, Summers, Spiller, and Hennrich were deliberately indifferent to Plaintiff's health or safety.

105. Defendants Cowan, Summers, Spiller, and Hennrich's conduct caused harm to Plaintiff.

106. Defendants Cowan, Summers, Spiller, and Hennrich acted under color of law.

WHEREFORE, Plaintiff requests that the Court issue judgment against these Defendants and award Plaintiff compensatory and/or punitive damages in an amount to be determined at trial, along with any injunctive relief requested or otherwise determined to be appropriate and proper under the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. Compensatory and punitive damages as allowed by law.
2. Injunctive relieve including:
   a. Transfer from Menard to Dixon Correctional Center Rehabilitation or Pontiac Correctional Center Protective Custody Unit.
   b. Further medical attention for shoulder; including an MRI and any necessary follow-up care as determined by a medical specialist.
   c. Expungement of records and disciplinary convictions described above.
   d. Amendments to IDOC policies and procedures relating to the housing of protective custody inmates with general population inmates in the segregation unit.

    e.    Any other injunctive relief determined to be appropriate by this Court.

3.    Attorneys' fees, expenses, and costs of this action as allowed by law.

4.    Such further relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  July 20, 2011                            Respectfully submitted,

                                                            By:  /s/Mark R. Miller
                                                                 Kenneth A. Wexler
                                                                 Mark R. Miller
                                                                 Wexler Wallace LLP
                                                               55 W. Monroe Street, Suite 3300
                                                               Chicago, IL  60603
                                                               (312) 346-2222 – Telephone
                                                               (312) 346-0022 – Facsimile
                                                               kaw@wexlerwallace.com
                                                               mrm@wexlerwallace.com
                                                               ***Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of the foregoing ***Second Amended Complaint*** to be served via electronic and First Class U.S. Mail, with proper postage prepaid, this 20th day of July, 2011.

/s/ Mark R. Miller